## SURBAUGH et al. v. HUBBARD & CO.

(Circuit Court of Appeals, Third Circuit. July 21, 1922. Rehearing Denied October 10, 1922.)

No. 2838.

Patents ⨺328—1,212,582, for shovel, held valid and infringed.

The Surbaugh patent, No. 1,212,582, for a shovel having corrugations extending into the socket and so co-operating with the handle socket as to increase the working strength, while at the same time lessening the weight, *held* valid and infringed.

Appeal from the District Court of the United States for the Western District of Pennsylvania; Charles P. Orr, Judge.

Suit by John S. Surbaugh and another against Hubbard & Co. Decree dismissing the bill, and plaintiffs appeal. Reversed and remanded, with instructions.

Charles M. Clarke, of Pittsburgh, Pa. (W. G. Doolittle, of Pittsburgh, Pa., of counsel), for appellants.

E. W. McCallister, of Pittsburgh, Pa., for appellee.

Before BUFFINGTON, WOOLLEY, and DAVIS, Circuit Judges.

BUFFINGTON, Circuit Judge. This case concerns a patent for a shovel. Although one of the earliest and most generally used of tools, there has probably been the least inventive improvement made of it. When, therefore, we find a shovel which is more easily and more cheaply made, which couples to a lightness that eases labor a toughness that withstands use strain, and an evenness of balance that lessens torsional side turning, our attention is challenged by something novel in a practically unchanging art. Touching these advantages, we note the testimony of Grandon, a miner, who says:

"Well, I have several reasons for using the Pacemaker. The first is the service it gives. It lasts longer than the Coal Bluff or any other shovel I have ever gotten hold of. And then it is so finely balanced; it doesn't turn in your hand. It is even a finer balance, and the weight is more equally distributed over the surface, than any shovel I ever used. That's why I use it. * * * A miner would pick up a shovel, and he looks at the way it balances in his hand. Then he puts it down on the floor and tries it that way. If it bends very easily, he throws it aside, and he will take up another one, until he finds one that is reasonably strong. That's the proof of a good shovel. There are two proofs; the only ones I ever used in my life is how the shovel would balance when you held it ready for work, and as to its strength when you bear on it. That's the only way I ever demonstrate a shovel."

Barnes, another miner, testified:

"Q. 13. Tell us why you prefer these other two shovels to this hollow-backed shovel. A. Why, they don't split down the center, like the hollow-backed shovel. And there's more strength to them grooves in them, or corrugations, as they call them, prongs; and your coal don't stick on your shovel, like it does on that shovel there. Q. 14. You mean that your coal does stick on your shovel in using the hollow-back? A. Yes; it will stick on it, if it is a little damp. Q. 15. And it will not stick on the Coal Bluff or Pacemaker? A. No, sir; them forks there, I believe, get it and take it off. Q. 16. Did you ever

⨺For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

use either of these shovels, Coal Bluff or .the Pacemaker, in prying operations? A. Yes, sir. Q. 17. Is there any advantage in them for that purpose? A. Yes; they are a better shovel for that business than a hollow-back shovel. Q. 18. In buying these shovels, how do they compare in price with the hollow back? A. Well, I can't tell you exactly how, because it is so long since I used the hollow-back shovel. Q. 19. What is your own estimation of their value in comparison with the hollow-back? A. Well, I would sooner pay the extra price for the corrugated shovels, for the two-prong or three-prong shovels, than pay the small price for the hollow-back, because they last longer. Q. 20. And what is the extra price? A. Well, I can't just tell you that at the present time. Q. 21. How do they compare in length of time that they last with the hollow-back? A. Oh, your hollow-back shovels, I can wear one out each month. Q. 22. How about the Coal Bluff? A. Well, I've got a Coal Bluff now, if that is what you call a Coal Bluff—I am working with a Coal Bluff now for about four months. Q. 23. This is a Coal Bluff? A. Well, for four months I have worked with one of them, and I have still got it yet, and it's good. And that Pacemaker, I had one, and wore it out, and it lasted me in the neighborhood of about nine months."

Comparing the simply corrugated shovel of the old art and the corrugated prong shovel of the patent, here described as the Coal Bluff and Pacemaker shovel, Wilson, a jobber of shovels, says:

"Q. 6. What is a corrugated shovel? A. A corrugated shovel is one which has ribs running in the body of the shovel, but not necessarily from the handle of the shovel. In fact, a corrugated shovel to the trade is known as the shovel which does not have ribs joined onto the handle or fork. Q. 7. Have you seen, and do you know, what is called the 'Coal Bluff' shovel? A. Yes; we have handled the Coal Bluff for the past year and a half or more; more extensively in the past year and a half. Q. 8. And before that time you sold these corrugated shovels, did you? A. Yes, sir. Q. 9. What difference, if any, did it make in your business when you commenced to handle the Coal Bluff? A. We have increased our sales on shovels about 25 to 30 per cent. And the difference in sales, we can only specify fork or prong shovels in all orders. Q. 10. What do you understand by fork or prong shovels? A. We understand it to be a Coal Bluff shovel or Pacemaker shovel. Q. 11. What is the Pacemaker shovel? A. That is a shovel manufactured by the Pittsburgh Shovel Company, of a three-pronged type, joined in the center. Q. 12. Is that the shovel that I now show you? A. Yes, sir. Q. 13. And bearing the name Pacemaker on the label? A. Yes, sir. Q. 14. What difference is there between these two shovels, if any? A. There is a probability of added strength in the additional prongs of the shovel; and in the makeup here, you could add strength right here. Q. 15. How do these two shovels, the Coal Bluff and the Pacemake, compare with the so-called . corrugated shovels in efficiency, strength, and so on, if you know? A. Oh, from our sales I would say that they must outlast and must be more efficient shovels, or they would not have continued to sell when the other shovel was on the market; but the sales have dropped off entirely,. and we have discontinued the sale of the corrugated shovel. Q. 16. How does the selling price compare with the so-called corrugated shovel? A. It is a dollar a dozen higher."

Beiter, engaged in miner supply business and covering three extensive mining counties of Pennsylvania, says he sells "from 50 to 60 dozen of Coal Bluff and Pacemaker to one dozen of the old style." Tovey, a salesman who sold to the trade in Ohio, West Virginia, Maryland, and Delaware, testified:

"Q. 5. What particular make of shovels do you sell through that territory? A. You mean coal shovels? Q. 6. Yes. A. Coal Bluff and Pacemaker. Q. 7. Do you sell directly to the consumers, or to whom? A. To the jobbing trade. Q. 8. Do you ever meet the users of these shovels? A. Oh, yes. Previous to that, I was connected with a firm that sold to the retail trade. Q. 9. What is

the general estimation of these through the trade, and, as far as you know, of the users? A. Well, there is great demand for them. Q. 10. Do you know just why? A. Particularly on account of the construction of the shovel. Q. 11. Well, have you in mind any particular features of construction that would confirm that answer? A. Yes; on account of the prong of the shovel coming down through the center, and the two prongs distribute the strain of the shovel on the whole body of it, instead of just in one part, as in the old type of shovel and the strength it gives to the body of the shovel. Q. 12. Did you sell any other kinds of types of shovels before these? A. Yes, sir. Q. 13. How do your sales of Coal Bluff and Pacemaker compare with such sales? A. They are a great deal more than the other. Q. 14. Is the demand increasing or decreasing? A. Increasing, considerably."

Walsh, treasurer of the plaintiff company, which makes the patented shovel, testified to the rapid and steady increase of sales, except in the steel strike year, 1919. Referring to the Pacemaker type, he says:

"I have them grouped. For the year 1917 we manufactured in Pacemakers 4,692⅙ dozen; for the year 1918 we manufactured 6,764⁸/₁₂ dozen; for the year 1919 we manufactured 4,137¹¹/₁₂ dozen; and for the year 1920 we manufactured 9,409½ dozen."

And referring to the Coal Bluff:

"Yes, in the year 1917 we manufactured 1,781¼ dozen; in the year 1918 we manufactured 3,125¼ dozen; in the year 1919 we manufactured 3,544¹⁰/₁₂ dozen; in the year 1920, 6,438¾ dozen."

Indeed, it is quite evident, from the testimony of Smith, one of the defendant's officials, that the demand for these shovels was so insistent that the defendant was forced to make the Gold Bee shovel, the alleged infringing device. His testimony in that regard is:

"There appeared to be a demand for a shovel with that design frog, and as I found the situation in this district, the sale was limited to one jobber, and that was Grier Bros.; that is, the Pittsburgh Shovel Company was selling only to Grier Bros., and naturally some of the other jobbers assumed that they had an advantage, and wanted that type of shovel. Q. 8. Why did the trade want this type of shovel? A. Well, it was something new in design. * * * Q. 37. And you got up this Gold Bee shovel, with this new design, to satisfy a demand of the trade, did you not? A. Yes, sir. * * * There was a demand for a two-prong shovel that couldn't be satisfied in this district. The situation as I found it was that one jobber here had the exclusive selling arrangement with the Pittsburgh Shovel Company; so, as I found it, other jobbers, outside of Grier Bros., couldn't get a two-prong shovel, for which reason we made these."

Seeing that the new type of shovel made by the plaintiff met with rapid success, we naturally inquire wherein it differed from the old art. The shovel of this patent is made in a single piece. But the single-piece shovel the art already had, and there was therefore no novelty in a one-piece shovel, in which the blade and handle socket were embodied in an integral whole without riveting or welding. The new shovel has the most desirable construction, in that it is a one-piece article, integral, dispensing with riveting or welding, but such one-piece, integral construction was found in the prior art. The new shovel also has the most desirable construction, in that it is hollow-backed; that is, so constructed that the hollowed back of the integral blade makes an opening or socket adapted to receive the shovel handle; but such a hollow-back handle attachment embodied in a one-piece shovel was

likewise found in the prior art. So, also, were corrugations in the shovel blade as a means of strengthening the shovel blade. Indeed, all of these points, corrugations, one-piece, hollow-back, were combined in a patent of this present patentee, No. 1,085,642, for a shovel, applied for July 5, 1912, and granted February 3, 1914. But even the shovel of this last patent, with all these individual points of excellence, left no impress on the art, and seems to have filled no special need, in spite of the fact that its corrugations added strength to the blade body, its open back provided a socket, its one piece gave comparative lightness of weight and its manufacture economic, while the patent in suit, No. 1,212,582, which only purported to be an improvement on such previous patent, met with marked and instant approval and large sales.

Wherein did the improvement·lie? The answer is that Surbaugh, in his new device, disclosed a very simple way of merely extending the corrugations of the shovel body over into the socket, and·thereby make the corrugations of the blade proper so co-operate in a new way with the handle socket of the hollow back that he was able to increase the working strength of his shovel, while at the same time he lessened its weight by using lighter blade material. In the practical use of the shovel, both as a shovel and also as a pry, it was found the patented shovel had more strength to pry and less weight to carry. To the casual observer those seem factors of small moment, but when the miner who uses a shovel in cramped space and in awkward positions, finds its weight lessened and its torsional balance nevertheless improved, such things are of real moment to him, and when, in spite of such lessened weight, he finds the strength and prying power of the shovel increased, we can readily see why the new shovel so displaced the old ones that, as defendant says, they were forced to make the alleged infringing article. This use of corrugations as a new co-operating factor is best illustrated by these illustrations:

No. 1,085,642                    No. 1,212,582

Figures 2 and 3 are taken from Surbaugh's earlier and Figure 2ª and Figure 3ª from his later patent. In Figure 2 we find the ordinary corrugations used to strengthen the blade of the shovel, and in Figure

3 substantially the same thing, save that the corrugation takes a bend or angle toward the center of the blade and toward the hollow-back handle socket, the purpose of which is stated in the specification:

"Fig. 3 is a view similar to Fig. 2, except that the rear ends of the ribs for reinforcing the shovel are bent toward the handle to add greater strength to the shovel blades."

From this statement of the patentee, it would seem that the shovel blade would have been strengthened in the same way if the ends of the corrugation had been turned toward the rim of the shovel, instead of inward toward the handle socket; the sole purpose being to add another corrugation to the shovel blade, or, as stated, "to add greater strength to the shovel blades." It will also be noted that the form of the corrugation, viz. widest at the line 16ᵃ, and tapering to a point at both ends, had in view the strengthening of the shovel blade on the line 16ᵃ, where the bend of the blade tended to produce crystallization, viz.:

"It will be noted that the ribs above noted have their greatest width at the meeting point 16 a of the flange 13 and the blade portion of the shovel, and that they taper gradually toward their extremities, as shown, which construction gives the greatest strength at the point of greatest strain, through the crystallization of the material along the line 16a."

That the whole purpose Surbaugh had in view in his earlier patent was the strengthening of the shovel blade alone is apparent not only from the physical construction of the shovel, but it also is evidenced by his express statement, viz.:

"The main object of this invention is to remedy this difficulty by increasing the strength and rigidity of the shovel blade, without increasing the weight, by providing the ribs, heretofore described."

But in the patent in suit, as we read it, Surbaugh turned his attention to first strengthening the open handle socket through corrugations, and then using the increased strength of the open handle socket to strengthen the shovel blade. This was done by the simple process of carrying further and broadening out the upper ends of the shovel blade corrugations, and instead of running them to a narrow point near the handle socket, with no strengthening of such socket, he broadened the upper end of the shovel blade corrugation, and carried such breadth not near, but into, the even broader corrugations which formed the open handle socket. The form which this lengthened and broadened corrugation of the shovel blade took when it entered into the handle socket was the two-prong shape of Figure 2ᵃ or the three-pronged shape of Figure 3ᵃ, as shown above.

The purpose to strengthen both socket and blade by such corrugation extension and co-ordination is stated in the specification, viz.:

"Fig. 2 is a top or plan view of one of the blanks shown in Fig. 1, converted into a finished shovel or scoop."

And in claim 1, viz.:

"A shovel or scoop blade comprising a unit blank provided with an integral shank, said blank being crimped to provide a flat portion with raised sides and

back, said shank being rolled into a hollow tube, adapted to receive a handle, said tube having its inner end bifurcated, said bifurcated ends entering the flat portion of the blank at different points."

It will thus be seen how the extended and co-operating corrugations of the last patent of Surbaugh gave to the miner a lighter shovel than he had before, but with that lighter shovel there was, nevertheless, an increased strength that enabled him to use the shovel as a pry in a more forceful way than the heavier one of the earlier art, including the shovel of Surbaugh's earlier patent.

We are therefore of opinion that the patent in suit is valid, and giving due regard to the several claims here involved, we find them infringed. We deem it proper to say we have not overlooked the contention that the corrugations of the shovel plate of Surbaugh's earlier patent was carried into the curve of the handle socket, and that this is evidenced by the words of his specification:

"Figure 3 shows that portion of the ribs 16, which extend across the face of the flange 13, being formed at an angle, so that their rear extremities terminate in or near the central frog 14, thus insuring greater torsional support to the handle socket."

But several things are to be borne in mind: First, Figure 3a shows a distinct space between the narrowed end of the angled corrugation and the line of the handle socket; second, the Patent Office, with Surbaugh's older patent before it, and the statement that the later one was an improvement on his earlier one, differentiated the two by the grant of the second patent; and, lastly, an inspection of the file wrapper shows that the original language in it was "terminate near the central frog 14," and that without any requirement by the Patent Office, and without erasing the word "near," which correctly described Figure 3, the words "in or" were added, without any apparent reason. We are therefore warranted in regarding the words "in or" as simply an alternative of "near."

Holding these views, the decree below, dismissing the bill, must be reversed, and the record remanded, with instructions to reinstate the bill, enter a decree adjudging the patent valid, the claims in issue infringed, and directing an accounting.